**Paul and Juanita BICKERTON,**
**Petitioners,**

v.

**INSURANCE COMMISSIONER,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 6, 2002.
Decided Sept. 20, 2002.
Reargument Denied Nov. 14, 2002.

Jay M. Apfelbaum, Pittsburgh, for petitioner.

No appearance entered on behalf of respondent.

BEFORE: McGINLEY, Judge, COHN, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge COHN.

Paul and Juanita Bickerton petition for review of an order of the Insurance Commissioner, M. Diane Koken, who affirmed the denial of Catastrophic Loss Benefits to the Bickertons. We affirm.

In August 1987, Paul Bickerton (Mr. Bickerton) suffered severe head injuries in an automobile accident and, consequently, was eligible for benefits from the Catastrophic Loss Benefits Continuation Fund (Auto CAT Fund) for reasonable and necessary expenses for medical treatment and rehabilitative services related to the accident. Mr. Bickerton lacks a sense of safety and judgment and requires twenty-four hour unskilled home health care. He needs supervision and care for most routine activities of daily life, as well as specialized care, such as catheter care, medication administration, and special treatment of his left ear due to missing bone. Since 1990, Juanita Bickerton (Mrs. Bickerton) has been Mr. Bickerton's primary caretaker, assisted by her son, Jonathan Cain (Cain), and employee, Samantha Rae Hancheck.

To receive benefits, Mrs. Bickerton filed claims on Mr. Bickerton's behalf, seeking compensation for the services she provided as Mr. Bickerton's caregiver. Mrs. Bickerton submitted invoices for reimbursement of home health care she provided to Mr. Bickerton to Inservco Insurance Services, Inc. (Inservco), the third-party claims administrator for the Auto CAT Fund. Between 1993 and 1998, Mrs. Bickerton submitted invoices and was paid $5.00 an hour for 24 hours a day for the home health care she provided to Mr. Bickerton. In April 1999, Mrs. Bickerton submitted invoices for care allegedly provided from February 1998 through June 1998. Around the same time, Inservco revised the invoice form at the suggestion of the Pennsylvania Attorney General.

The new form required the person who rendered the services to sign the invoice and swear the information on the invoice was true and correct. Additionally, the form contained a notice concerning insurance fraud. It was approved for use as of June 1999.

Inservco repeatedly told Mrs. Bickerton that she needed to provide more detail on the invoice form and that it wanted to see tax records and daily logs, which she failed to provide. Upon investigation, Inservco discovered, and Mrs. Bickerton admitted, that she did not provide all the services herself. Services were provided by other family members or employees of Mrs. Bickerton's day care business. Inservco also discovered that Mrs. Bickerton had purchased a home for her day care business and was not always present in the home with Mr. Bickerton, and that Cain was an over-the-road truck driver who was away during the week and could not have performed the services listed on the invoices because he was working. The times and dates that services were rendered were also fabricated.

Inservco denied payment for home health care services for Mr. Bickerton on October 6, 2000 because the services on the invoices were not properly documented. Mrs. Bickerton appealed to the Insurance Commissioner, who affirmed Inservco's decision "without prejudice to any provider, including a family member of [Mr. Bickerton] to submit properly documented invoices and receive appropriate payment...." This appeal followed.

■ We initially note that our scope of review of a decision of a Commonwealth agency is limited to determining whether constitutional rights have been violated, an error of law has been committed, or whether the findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. *Stiffler v. Insurance Commissioner*, 786 A.2d 296, 298 n. 6 (Pa.Cmwlth. 2001).

■ Mrs. Bickerton first argues that she is entitled to submit invoice forms to the Auto CAT Fund for reimbursement which state only that she was "monitoring" Mr. Bickerton, rather than listing on the forms specific services such as bathing and feeding. We disagree.

■ Section 1761 of the Catastrophic Loss Trust Fund Act (Act) provides for catastrophic loss benefits. (*Formerly* Section 1761 of the Catastrophic Loss Trust Fund (Trust Fund), 75 Pa.C.S. § 1761.)[1] Section 1761 defines "catastrophic loss benefit" as "[p]ayments by the Catastrophic Loss Trust Fund for those reasonable and necessary expenses for medical treatment and rehabilitative services which, as

---

1. The Catastrophic Loss Trust Fund (Trust Fund) was established by Subchapter F of the Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa.C.S. §§ 1761–1769, now repealed. The Pennsylvania Insurance Department was charged with the administration and enforcement of the MVFRL and the Trust Fund. 75 Pa.C.S. § 1704(b). The Trust Fund was funded by an annual assessment levied upon all motor vehicles required to be registered in the Commonwealth. 75 Pa.C.S. §§ 1762, 1764, now repealed.... Subchapter F of the MVFRL was then repealed by the Act of December 12, 1988, P.L. 1120. Neverthe-

less, the payment of catastrophic loss benefits was preserved for persons suffering such loss prior to June 1, 1989, by Section 7(a) of the Act of April 26, 1989, P.L. 13, *as amended,* 75 Pa.C.S. § 1798.2(a). In other words, benefits for these persons remain payable as if the Trust Fund legislation had not been repealed. In order to preserve these benefits, the General Assembly created the [Auto] CAT Fund described above and transferred all funds from the defunct Trust Fund to the [Auto] CAT Fund. 75 Pa.C.S. § 1798.4.

*Stiffler v. Insurance Commissioner,* 786 A.2d 296, 297 n. 2 (Pa.Cmwlth.2001).

described in section 1712(1), exceed $100,000...." Section 1712(1) of the Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa.C.S. § 1712(1), requires an insurer to make available first party benefits, which include, *inter alia,* benefits for reasonable and necessary medical treatment and rehabilitative services

> including, but not limited to, hospital, dental, surgical, psychiatric, psychological, osteopathic, ambulance, chiropractic, licensed physical therapy, nursing services, vocational rehabilitation and occupational therapy, speech pathology and audiology, optometric services, medications, medical supplies and prosthetic devices....

*Id.* This definition, which is not exclusive, does not list "monitoring" as falling within its parameters.

At the outset, we note that there is a dearth of case law interpreting what constitutes "rehabilitative services" and "reasonable and necessary expenses for medical treatment." In *Stiffler,* a recent case from this Court, Judge McCloskey examined the Auto CAT Fund provisions concerning rehabilitative services. In that case, the claimant, a paraplegic, submitted bills for reimbursement for a modified vehicle which would help him hunt and move through the woods, activities he enjoyed prior to his disabling injuries. Inservco denied benefits based on an independent medical examination after which the doctor concluded that the claimant's use of the modified vehicle to hunt, only as a hobby, would have no medical benefit and, therefore, was not medically necessary. The Auto CAT Fund upheld the denial of benefits. On appeal, the claimant argued that the use of the vehicle would be a rehabilitative service. We disagreed.

In making our determination, we relied on the definition of "rehabilitative services" given by the Insurance Commission-

er in her opinion supporting the denial of benefits. It described them as "accommodations that assist or improve a party's ability to perform daily activities, thereby allowing him to function, care and provide for himself with some degree of independence." *Stiffler,* 786 A.2d at 299. Judge McCloskey noted that the interpretation focused upon normal, everyday activities, and concluded that the use of the modified vehicle would not provide the claimant with any improvement in his physical condition because he had reached his maximum level of medical improvement. Essentially, this Court concluded that to be a reimbursable expense, the rehabilitative service had to provide some benefit which would assist or increase a claimant's ability to care for himself.

Turning to the present matter, we conclude that, as a matter of law, monitoring cannot fall within this definition because monitoring alone does not assist or increase Mr. Bickerton's ability to care for himself. Consequently, when Mrs. Bickerton asserts only that she is "monitoring" Mr. Bickerton, she is not providing "rehabilitative services."

Having determined that Mrs. Bickerton did not meet her burden to show that "monitoring" constitutes "rehabilitative services," we must still examine whether it is within the ambit of the term "reasonable and necessary expenses for medical treatment." In *Tagliati v. Nationwide Insurance Co.,* 720 A.2d 1051 (Pa.Super.1998), *petition for allowance of appeal denied,* 559 Pa. 706, 740 A.2d 234 (1999), the Superior Court grappled with the interpretation of "reasonable and necessary medical treatment" under Section 1712(1) of the MVFRL. In that case, the defendant insurance company denied payment for thermographic studies on the basis that they were not reasonable and necessary medical treatment. The Court rejected this argu-

ment and held that thermography was reasonable and necessary medical treatment under certain circumstances.[2] In making its determination, the Court set forth an objective standard to determine if any medical treatment was reasonable and necessary. It stated that (1) the insured must demonstrate that the treatment was warranted by the circumstances, and (2) the value of the treatment must be verified by credible and reliable evidence. *Id.* at 1056. Implicit in this definition, of course, is that there also must be a "treatment." The word "treatment," according to *Merriam–Webster's Collegiate Dictionary* 1254 (10th ed.2001), is "the act or manner or an instance of treating someone or something." This definition indicates overt action and, thus, to be engaged in treatment some affirmative physical act is required by Mrs. Bickerton, not merely passive observance, as meant by the term "monitor" which means merely to watch. *Id.* at 750.[3] We believe that the Superior Court set forth the appropriate analysis, particularly since Section 1712(1) is incorporated by reference in Section 1761.

Turning to the analysis set forth in *Tagliati*,[4] Mrs. Bickerton has satisfied the first requirement that monitoring is warranted under the circumstances. Clearly, the care she provides for Mr. Bickerton is necessary given his mental and physical limitations. Additionally, it is not contested that Mr. Bickerton is entitled to benefits from the Auto CAT Fund. With regard to the second requirement of the test, she has supplied the medical opinion of Dr. Lieber, who stated that Mr. Bickerton needs 24–hour monitoring, as support for her contention that she is entitled to reimbursement from the Auto CAT Fund for monitoring. However, with regard to the necessary requirement that there be "treatment," that is, the need for an affirmative physical act, monitoring alone is not sufficient. This does not mean that other affirmative services provided (such as bathing or feeding) could not be reimbursable IF identification of those services appeared on the form, a point we address in our discussion below. Had Mrs. Bickerton listed the specific services she provided for Mr. Bickerton, the Auto CAT Fund would have had a clear indication of precisely what she was doing for him and may well have granted the reimbursement.

Essentially, the conflict between Mrs. Bickerton and the Auto CAT Fund arises from Mrs. Bickerton's belief that she does not need to specifically identify the services or treatment provided to Mr. Bickerton, but that she is only required to set forth the blocks of time where care is rendered to Mr. Bickerton. The Auto CAT Fund, on the other hand, asserts that the statute requires specific services be listed on the invoices as proof that (1) Mr. Bickerton is being cared for and (2) the

---

2. In so doing, it noted that because the term "reasonable and necessary medical treatment" was statutorily undefined, it would be given its ordinary meaning. *See* Section 1903(a) of The Statutory Construction Act of 1972, 1 Pa.C.S. § 1903(a). It also examined the intent of the General Assembly in enacting the MVFRL. *See generally* Sections 1921 and 1922 of The Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1921, 1922. We have searched for definitions of the terms "rehabilitative services" and "reasonable and necessary medical treatment" in other statutes and have found none.

3. This is in accord with the definitional list in section 1712(1), which contains only overt actions (e.g. nursing services, dental), or tangibles such as medications, medical supplies and prosthetic devices.

4. Preliminarily, following our review of the statutory language in Section 1712(1), listing what constitutes reasonable and necessary medical treatment, we conclude that the general term of "monitoring" is not included in the definitions.

Auto CAT Fund is paying for services that come within the ambit of the statute. Inherent in the term "monitoring," as defined above, is that other activities may be performed while "monitoring" or watching another person. We do not believe that the legislature intended that Mrs. Bickerton, while "monitoring" Mr. Bickerton, should be compensated where her time is actively spent on activities such as running her daycare business, sleeping, attending to personal errands, or socializing, even if socializing with Mr. Bickerton.

■ Mrs. Bickerton additionally contends that activities such as laundry care, housecleaning, and food preparation should also be compensable services. However, we agree with the Commissioner that those activities would have been performed in the household even if Mr. Bickerton had not been injured in 1986. A somewhat similar statute, the Pennsylvania No–Fault Motor Vehicle Insurance Act (No Fault Act), Act of July 19, 1974, P.L. 489, *formerly* 40 P.S. § 1009.103, *repealed by* Section 9 of the Act of February 12, 1984, P.L. 53, contained a specific provision for reimbursement for "replacement services" for an aggregate one-year period for insureds who suffered injuries. Under the No–Fault Act, "replacement services" included such activities as laundry care and housecleaning services. Because the General Assembly included such a specific provision in the No–Fault Act, and did not do so in the Trust Fund statute, we conclude, based on the concept of *"expressio unius est exclusio alterius,"* that the General Assembly did not set up the Trust Fund, and now the Auto CAT Fund, to reimburse claimants for those types of services.[5]

■ Next, Mrs. Bickerton argues that the Commissioner erred in finding the itemization of services required by the Auto CAT Fund is a reasonable requirement and the minimum documentation necessary to permit the Auto CAT Fund to carry out its responsibilities. We disagree.

Regulations promulgated by the Insurance Department provide procedures for the establishment and administration of the Auto CAT Fund. *See* 31 Pa.Code §§ 67.1—67.35. Specifically, the regulations provide that the administrator of the Auto CAT Fund is authorized to obtain data or information from claimants that is necessary to permit review of claims for Auto CAT Fund benefits. 31 Pa.Code § 67.5.

---

**5.** This legal maxim has been used by the Court before. For example, in *Kramer v. Workers' Compensation Appeal Board (Rite Aid Corp.)*, 794 A.2d 953 (Pa.Cmwlth.2002), the employer funded severance payments to the claimant pursuant to a collective bargaining agreement and then claimed a statutory offset credit for those payments against the claimant's workers' compensation benefits. The claimant argued that the employer was not entitled to a statutory credit even if it did fund payment of the severance benefit because the employer was not directly liable for the payment of the claimant's workers' compensation benefits as stated in Section 204(a) of the Workers' Compensation Act. The Court was called upon to interpret the provisions of 204(a) in these circumstances. In interpreting the statute, the Court noted that:

Here, the legislature simply could have provided the credit to employers liable for the payment of workers' compensation. Consequently, by restricting the beneficiaries of the credit to employers *directly* liable for such compensation, the legislature indicated an intent to further narrow the class that might claim an offset pursuant to this provision of the [Workers' Compensation] Act. Moreover, we note that section 204(a) of the Act provides the severance credit only to employers, making no mention of insurers in that credit provision. Courts have often relied on the maxim *"expressio unius est exclusio alterius;"* that is, where the legislature expressly mentions one thing in a statute, we must assume that it intended to exclude all things omitted.
*Id.* at 959–60 n. 15.

In the present case, Mrs. Bickerton argues that Inservco's reliance on Regulation 67.5 for requiring detailed records of activities is drastic and prejudicial. She asserts that detailing the kinds of services she provides for Mr. Bickerton is unrealistic and unreasonable given the fact that she is paid $5.00 per hour for the services she renders. Mrs. Bickerton points out that she is monitoring Mr. Bickerton and not providing specific services to him. She likens the monitoring services she provides to Mr. Bickerton to those provided by personal care and nursing homes.

The Auto CAT Fund, on the other hand, argues that Inservco amended its form, effective June 1999,[6] to include (1) the signature of the person rendering the services certifying that the services had been rendered, and (2) a notice concerning insurance fraud. It changed nothing about its reporting requirements. Additionally, the Auto CAT Fund asserts that, as part of its statutory and fiduciary duty, Inservco requires a general description of the services rendered so that the expenditure of funds is the most prudent possible and assists in the detection of insurance fraud and asset abuse.

We agree with the Commissioner that Inservco has the authority to require the detailed information requested and that such detail assists in conserving the Auto CAT Fund's resources. We note that what is troubling here is that Mrs. Bickerton submitted invoices wherein she could not account for her time, and which she admitted under oath that she had fabricated. She misled Inservco when she prepared the invoices showing that certain services were performed at certain times, when, in fact, she had no knowledge of the particular services provided to Mr. Bickerton and who provided them. We agree that her inability to complete the invoices as required was not due to the amendments to the form, but due to her failure to actually provide certain of the services and to document carefully those that she did provide. While we certainly commend Mrs. Bickerton for her dedication to caring for her severely disabled husband, and the record reflects that Mr. Bickerton is well-cared for, nonetheless, we believe that the statute and regulations require documentation listing the specific services she rendered to Mr. Bickerton in order for her to be compensated. Consequently, we determine that the Commissioner committed no error in affirming the denial of payment for services.[7]

Accordingly, the order of the Commissioner is affirmed.

---

**6.** We note that the invoices in question were from services rendered from February 1998 to June 1998. The invoices were submitted in April 1999, before the effective date for the new form of June 1, 1999. In any event, both the old and the new forms required the same level of detail of services provided to Mr. Bickerton, which Mrs. Bickerton failed to indicate. Additionally, Mrs. Bickerton still has the opportunity to submit new invoices for the period in question because the Commissioner denied the payment for services without prejudice.

**7.** Mrs. Bickerton also argues that the revised invoice form violated the Commonwealth Documents Law (CDL), Act of July 31, 1968,

P.L. 769, 45 P.S. §§ 1102–1208. She asserts that the change in the invoice form and procedures are substantive. However, as the Commissioner points out, the CDL does not apply to the invoice form. Section 1765(e) of the Trust Fund Act and Insurance Department regulations 67.5, 31 Pa.Code § 67.5, authorize the Insurance Department to solicit information to aid in reviewing a claim. They do not create substantive rights or standards. Indeed, Inservco has *always* required the information it seeks from Mrs. Bickerton. The changes to the invoice form do not affect this requirement. Consequently, the CDL does not apply.

## ORDER

**NOW,** September 20, 2002, the order of the Insurance Commissioner in the above-captioned matter is hereby affirmed.